UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS BROWN,

                Plaintiff,                                  Case No. 1:14-cv-1196

v.                                               HON. JANET T. NEFF

ROCK-TENN SERVICES, INC.,

                Defendant.
_____/

**OPINION**

Plaintiff Curtis Brown filed this action against Defendant Rock-Tenn Services, Inc. alleging a claim under the Family and Medical Leave Act (FMLA). Pending before the Court is Defendant's Motion for Summary Judgment (Dkts 96, 97); Plaintiff has filed a Response (Dkt 100), and Defendant has filed a Reply (Dkt 101). Having fully considered the parties' submissions, the Court concludes that oral argument would not assist in the disposition of the issues presented. *See* W.D. Mich. LCivR 7.2(d).

For the reasons that follow, Defendant's motion for summary judgment is granted in part and denied in part.

**I. Facts**

Pursuant to this Court's dispositive motion procedures, the parties have stipulated to the following comprehensive and well-drafted Joint Statement of Facts (JSMF) (Dkt 103) for purposes of the motion:

1.   Rock-Tenn operates mills across the country that produce merchandising displays, corrugated packaging and consumer packaging, one of which is located in Battle Creek, Michigan.

2.   The Battle Creek mill produces paper and cardboard consumer packaging for snacks, pasta and other dry foods.

3.   Plaintiff Curtis Brown began his employment at the Battle Creek mill on September 30, 1996.[1]

4.   Plaintiff was a member of the Graphic Communications Conference/International Brotherhood of Teamsters, Local #705S of District Council 3 (the "Union").

5.   The terms and conditions of Plaintiff's employment were covered by a collective bargaining agreement ("CBA").

6.   Plaintiff held a variety of positions throughout his career with Rock-Tenn, including reserve, sixth hand, fifth hand, fourth hand, third hand, and clay coater helper.

7.   Article 7.10 of the 7/1/09 to 6/30/13 CBA details the procedures for filling a shift, and requires supervisors to go up and down the line of progression of employees qualified to do the job.

8.   Plaintiff was on the overtime call-in list for back tender, [and] had worked in the position as recently as 2013.

Plaintiff's Work History

9.   Brown received disciplinary warnings during his employment. This was, on average, less than ½ a disciplinary write up a year.

---

[1]Rock-Tenn purchased the mill approximately one year later.

<u>Plaintiff's Certification for Intermittent FMLA Leave</u>

10. Plaintiff has been taking intermittent leave since approximately 2004 to care for his wife, Joanne.

11. To take these leaves, Plaintiff would call a third-party administrator, whose telephone number was posted in the plant, to report his leave usage.

12. Relevant documentation would also be submitted to the third-party administrator at the Benefit Service Center, not to Plaintiff's supervisor.

13. The CBA requires employees to call in one hour ahead of any absences.

14. Plaintiff did not receive a Handbook containing FMLA procedures.

15. Plaintiff received written documentation advising him "How to Report Intermittent Absences" to the Benefits Service Center.

16. No one from Rock-Tenn told Plaintiff that he would be terminated or disciplined for using FMLA leave.

17. No management employee ever made negative statements regarding Plaintiff's FMLA usage or his wife's medical condition.

18. Each time Plaintiff used leave prior to September 2013, he was returned to the same position, with the same wages and benefits.

19. Plaintiff used FMLA leave a total of 5 times in 2011 to 2013.

<u>Events in the Summer and Fall of 2013</u>

20. On July 17, 2013, Plaintiff received a letter requesting updated documentation from his wife's health care provider to support his need for continued absences.

21. On August 30, 2013, Plaintiff received a letter detailing the steps he needed to take to certify his leave request.

22. The letter included a Health Care Provider Certification Form and the "How to Report Intermittent Absences" flyer, and instructions for Plaintiff to return [the] form to the Benefit Service Center.

23. On or about September 11, 2013, Joanne Brown's (Plaintiff's wife's) psychiatrist, L. Humberto Covarrubias completed the Health Care Provider Certification Form.

24. The "serious health condition" identified by Dr. Covarrubias was described as "recurrent episodes of distress with confusion, disorientation, fall risk, mood liability, chronic gastrointestinal symptoms" as well as "pancreatitis."

25. Dr. Covarrubias had last treated Joanne Brown on September 5, 2013, with her next scheduled appointment three months later.

26. On September 19, Plaintiff received a notice approving his intermittent leave request, which again enclosed another "How to Report Intermittent Absences" flyer.

Events on September 27, 2013

27. On the evening of September 26, 2013, Plaintiff's wife told him that she had to go to the doctor the following day and wanted him to go with her. Plaintiff said he was scheduled to work, but agreed to take her.

28. On September 27, 2013, Plaintiff was scheduled to work a 7 AM to 3 PM shift, but arrived at 2:38 am to work overtime "on the front end."

29. Plaintiff was assigned to work "second back tender" in the machine room, which was different than his regular position as a clay coater helper.

4

30. When Plaintiff arrived for the start of his overtime shift, he did not tell anyone at Rock-Tenn that he had to leave his regular shift because his wife had a doctor's appointment.

31. Plaintiff did not, during his four hour overtime shift, tell anyone at Rock-Tenn that he could not work his regular 7 AM shift.

32. After Plaintiff's supervisor, Bob Whitelow, ordered Plaintiff to move up the line of progression and work as the back tender, Plaintiff said that he was going home "FMLA."

33. Because Brown had worked the "second back tender" position that morning, he was in the line of progression to work the "back tender" position.

34. Plaintiff did not mention his wife or her medical condition during this conversation with Bob Whitelow.

35. A few minutes later, Plaintiff and Whitelow had a second meeting. Whitelow again ordered Plaintiff to work the back tender position, and Plaintiff again stated he was "going home" due to the FMLA.

36. Whitelow paged Plaintiff over the intercom system and convened a third meeting, this time with Plaintiff's union representative, Ken Conklin, and Production Superintendent Stephen Rudy.

37. Plaintiff was instructed to work the back tender job.

39. Conklin advised Plaintiff that he was refusing a direct order and that he could be disciplined.

40. No one asked Plaintiff why he was going home.

41. Plaintiff did not perform any work between the start of his shift and leaving the plant.

42. Rock-Tenn subsequently suspended Plaintiff pending an investigation, and Tom Shannon informed Plaintiff that he was suspended for insubordination.

43. Plaintiff took his wife to Dr. Ismailoglu's offices, which is less than a half hour away from Plaintiff's home.

Termination of Plaintiff's Employment

44. On October 2, 2013, Rock-Tenn conducted an investigatory interview with Plaintiff.

45. Union president Stan Maurer, Plant Manager Tom Shannon, Stephen Rudy, and Human Resources Manager Karol Fecteau were also present. During this interview, Brown stated that he had performed the back tender position in 2013 and that he did not express any safety concerns when refusing the direct order from Whitelow.

46. Plaintiff read from a prepared written statement during the interview.

47. Plaintiff also stated that before the start of his regular shift on September 27, he did not tell anyone at Rock-Tenn that he was planning on taking his wife to a doctor.

48. The meeting was adjourned for a short time and when the parties returned, Rock-Tenn told Plaintiff he was terminated for gross insubordination for "not taking an instruction from his shift supervisor to go to the next job in line of progression as he was required to by the collective bargaining agreement."

49. Under the 7/1/09 to 6/30/13 collective bargaining agreement, engaging in gross insubordination permits immediate termination for a single occurrence.

Plaintiff's Grievance over his Termination

50. The Union filed a grievance regarding Plaintiff's termination.

6

51. During the Step 4 grievance meeting, Plaintiff presented a packet of information and argued that because the back tender machine had new equipment on it that he had not been trained on, it would have been unsafe for him to operate it without having had the training.

52. Rock-Tenn upheld the termination decision, denying the grievance.

53. The Union declined to pursue the case to arbitration.

<u>Plaintiff and His Wife's Visit to a Doctor's Office on September 27, 2013</u>

54. Plaintiff relies on a note written by Sonja Crothers, a Certified Medical Assistant in Dr. Ismailoglu's office, who is not licensed to provide medical treatment.

55. The note states that Plaintiff brought his wife into Dr. Ismailoglu's office on September 27, 2013.

56. Crothers explained that Joanne Brown showed up, mentioned a problem with her elbow and also asked for a copy of bone density scan test results.

57. Crothers looked at Ms. Brown's elbow, but did not provide treatment. She also provided Ms. Brown with the test results, but did not interpret the test results.

58. Crothers testified at her deposition that the results would have been mailed out to Ms. Brown, or Ms. Brown could have visited the office at the end of the day (i.e., after the 7 AM to 3 PM shift ended) to receive a copy.

59. Ms. Crothers also set an appointment for Ms. Brown for September 30, 2013.

60. Crothers confirmed that no other issues were discussed on September 27, 2013 with the Browns.

61. At the end of Crother's 10-15 minute encounter with Plaintiff and his wife, Crothers walked Joanne Brown to the reception desk "to make an appointment for the problem that she came in for."

62. Crothers confirmed that on September 27, 2013, no medical treatment was provided and no vital signs were taken.

63. Dr. Ismailoglu did not see or examine Joanne Brown at all on September 27, nor did any other health care provider.

64. Plaintiff states that the September 27, 2013 visit to Dr. Ismailoglu's office was a nonemergency.

65. Plaintiff does not know whether his managers were aware of his wife's medical condition while he was employed by RockTenn.

66. On August 13, 2014, Brown filed a charge of discrimination with the EEOC.

67. On August 25, 2014, the EEOC dismissed the charge.

Plaintiff's Complaint (Dkt 1) alleges two claims:  Count I, FMLA Violations; and Count II, American with Disabilities Act (ADA) Violations.  However, in response to Defendant's motion, Plaintiff states that he will no longer pursue his ADA claim.  Accordingly, the Court will grant Defendant summary judgment of Count II without analysis.

## II.  Legal Standards

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The court must consider the evidence and all reasonable inferences in favor of the nonmoving party.

*Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013); *U.S. S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013).

The moving party has the initial burden of showing the absence of a genuine issue of material fact. *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 200 (6th Cir. 2010). The burden then "shifts to the nonmoving party, who must present some 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "There is no genuine issue for trial where the record 'taken as a whole could not lead a rational trier of fact to find for the non-moving party.'" *Burgess*, 735 F.3d at 471 (quoting *Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "The ultimate inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sierra Brokerage Servs.*, 712 F.3d at 327 (quoting *Anderson,* 477 U.S. at 251-52).

### III.  Analysis

Defendant moves for summary judgment on the ground that Plaintiff cannot establish the prima facie elements of his FMLA claims and cannot demonstrate that Defendant's legitimate non-discriminatory reason for his termination was a pretext for discrimination. Defendant maintains that Plaintiff's employment was terminated because he engaged in gross insubordination.

Plaintiff asserts two separate claims under the FMLA: the first based on interference and the second based on retaliation. The parties do not dispute the general law governing proof of these claims. Defendant, however, advances a number of specific reasons that Plaintiff's case fails with regard to proof of certain elements of the claims, based in large part on the FMLA regulations. Plaintiff disputes that such "technical defenses" undermine his claims and otherwise argues that the

law and the record establish that he has made out a prima facie cases of both interference and retaliation, and that Defendant's legitimate reason for his termination was pretext.

Having fully considered the parties' arguments, the Court concludes that genuine issues of material fact preclude summary judgment on any of the various grounds advanced by Defendant.

### A.  FMLA Claims

The FMLA creates both "prescriptive" and "proscriptive" employee rights.  *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir. 2004).  Accordingly, the Sixth Circuit recognizes two distinct theories for recovery: (1) the "entitlement" or "interference" theory based on the statute's prescriptive rights, 29 U.S.C. § 2615(a)(1); and (2) the "retaliation" or "discrimination" theory based on proscriptive rights created in 29 U.S.C. § 2615(a)(2).  *Id.*

### B.  FMLA Entitlement/Interference Claim

29 U.S.C. § 2615(a)(1) provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided in this subchapter."  *See also* 29 C.F.R. § 825.220(b).  "To prevail on a claim for violation of an employee's prescriptive rights under § 2615(a)(1), the plaintiff need not show that he was treated worse than other employees, just that he was denied an entitlement under the Act."  *Hoge*, 384 F.3d at 244.  In order to establish his prima facie case of "entitlement or interference" under the FMLA, a plaintiff must show that: (1) he was an eligible employee; (2) the defendant is a covered employer; (3) he was entitled to leave under the FMLA; (4) he gave notice of his intention to take FMLA leave; and (5) the defendant denied or interfered with FMLA benefits to which he was entitled.  *Id.*  "An employer may violate § 2615(a)(1) regardless of the intent behind its conduct."  *Id.*; *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013).

10

Defendant does not dispute the first and second elements. Defendant argues, however, that Plaintiff cannot prove the remaining three elements: that he was entitled to intermittent FMLA leave; that he provided the requisite notice of his intention to take leave; and that he was denied FMLA benefits.[2]

### 1. Element 3—Entitled to Leave

Defendant asserts that Plaintiff was not entitled to use FMLA leave on September 27, 2013 for three reasons. First, the September 27, 2013 visit to the doctor's office did not involve treatment from a "health care provider," which under the regulations includes (among others) doctors, nurse practitioners and physicians assistants, 29 C.F.R. § 825.125(a), but not a certified medical assistant (CMA) such as Crothers, who saw Ms. Brown on September 27. Second, the office visit did not involve "continuing treatment," within the meaning of the regulations, 29 C.F.R. § 825.115. Defendant asserts that even if Ms. Brown had a "bump"[3] on her elbow, it was nothing more than a routine, short-term injury that is not-protected under the FMLA (Def. Mot. Br., Dkt 97 at PageID.560). Third, it is irrelevant that Plaintiff had an existing FMLA certification for intermittent leave, since the certification, completed by Dr. Covarrubias, Ms. Brown's psychiatrist, was for "pancreatitis" and "recurrent episodes of distress with confusion, disorientation, fall risk, mood liability, chronic gastrointestinal symptoms," and the September 27 office encounter did not involve any of these conditions.

---

[2]Defendant's argument as to the last element, that Plaintiff was not denied FMLA benefits, rests simply on Defendant's contention that Plaintiff was terminated for gross insubordination, which essentially is the ultimate question and is argued only in the context of other issues raised.

[3]Defendant refers to a "bump" while Plaintiff refers to a "lump."

11

Plaintiff notes that there is a dearth of case law concerning whether a CMA qualifies as a health care provider within the meaning of § 825.125(a), but argues that the circumstances support that the September 27 visit involved treatment consistent with the regulation.  Plaintiff asserts that Ms. Brown asked to see a doctor, but no doctor was available; consequently, she scheduled an appointment for September 30, which should be viewed as an extension of the September 27 visit—at which Ms. Brown received the bone density scan results that she subsequently discussed with Dr. Ismailoglu on September 30.  At that time, Dr. Ismailoglu treated her for the lump on her elbow, which was the problem she presented with on September 27.  Plaintiff argues he should not be denied the protection of the FMLA simply because no doctor was available on September 27.  Plaintiff asserts that the bone scan was obviously for continuing treatment, and a physician had previously seen Ms. Brown for her elbow problem on August 18, 2013, so she clearly was having continuing treatment.

Plaintiff contends that Defendant's argument that the elbow problem was not part of the certification for intermittent FMLA leave misses the point, because the purpose of the intermittent leave was to provide psychological comfort related to recurrent episodes of distress with confusion, disorientation, etc., including unknown issues.  And if the elbow problem would have theoretically qualified Ms. Brown for FMLA leave, then Plaintiff should be granted the same leave to accompany her.

Plaintiff's factual assertions have record support, and the Court cannot conclude, based on the record and arguments presented, that Defendant is entitled to a ruling as a matter of law that Plaintiff was not entitled to take FMLA leave.

Under the FMLA, 29 U.S.C. § 2612, an eligible employee is entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(C)   In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a *serious health condition*.

(Emphasis added).  "Serious health condition means an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a *health care provider* as defined in § 825.115."  29 C.F.R. §§ 825.102, 825.113 (emphasis added).

The definition of a "health care provider" under the regulations states in relevant part:

(a) The Act defines health care provider as:

(1) A doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or

(2) Any other person determined by the Secretary to be capable of providing health care services.

(b) Others capable of providing health care services include only:

(1) Podiatrists, dentists, clinical psychologists, optometrists, and chiropractors (limited to treatment consisting of manual manipulation of the spine to correct a subluxation as demonstrated by X–ray to exist) authorized to practice in the State and performing within the scope of their practice as defined under State law;

(2) Nurse practitioners, nurse-midwives, clinical social workers and physician assistants who are authorized to practice under State law and who are performing within the scope of their practice as defined under State law;

(3) Christian Science Practitioners listed with the First Church of Christ, Scientist in Boston, Massachusetts.  Where an employee or family member is receiving treatment from a Christian Science practitioner, an employee may not object to any requirement from an employer that the employee or family member submit to examination (though not treatment) to obtain a second or third certification from a health care provider other than a Christian Science practitioner except as otherwise provided under applicable State or local law or collective bargaining agreement;

13

(4) Any health care provider from whom an employer or the employer's group health plan's benefits manager will accept certification of the existence of a serious health condition to substantiate a claim for benefits; and

(5) A health care provider listed above who practices in a country other than the United States, who is authorized to practice in accordance with the law of that country, and who is performing within the scope of his or her practice as defined under such law.

(c) The phrase authorized to practice in the State as used in this section means that the provider must be authorized to diagnose and treat physical or mental health conditions.

29 C.F.R. § 825.125.

Here, there is no question that Plaintiff had a certification for intermittent FMLA leave from a "health care provider," Dr. Covarrubias, a psychiatrist.  Defendant's argument that the treatment Plaintiff sought is not encompassed in this certification is not persuasive—and at best rests on disputed issues of fact.  The certification establishes that Plaintiff's leave was based on Ms. Brown's serious health condition, i.e., "Chronic Conditions Requiring Treatment" (Pl. Ex. 2, Dkt 100-16 at PageID.978).  The certification form requires the medical facts describing the condition ("patient complaints, symptoms, examination or diagnostic test/study findings, prescribed medications"), which Dr. Covarrubias specified as: "Recurrent episodes of distress with confusion, disorientation, fall risk, mood liability, chronic gastrointestinal symptoms," along with a "Co-morbid Diagnosis" of "Pancreatitis" (*id.*).  Dr. Covarrubias indicated that Plaintiff's presence to provide psychological comfort would be beneficial to the patient or assist in the patient's recovery (*id.*).

Contrary to Defendant's argument, the approved FMLA intermittent leave is not so narrow that it conclusively excludes the treatment sought by Ms. Brown on September 27.  At a minimum, there are questions of fact on this issue.

14

Defendant contends that the September 27 visit to Dr. Ismailoglu's office did not constitute *treatment*, or specifically "continuing treatment" by a "health care provider," which are further reasons Plaintiff fails to establish element three of his FMLA claim—that he was "entitled" to intermittent FMLA leave on September 27. The Court is not persuaded that Defendant's arguments, and more particularly, Defendant's parsing of the statutory/regulatory language, supports such a conclusion.

Pursuant to 29 C.F.R. § 825.115, a "serious health condition" involving "continuing treatment by a health care provider" includes any one or more of the following:

(a) Incapacity and treatment. A period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(1) Treatment two or more times, within 30 days of the first day of incapacity, unless extenuating circumstances exist, by a health care provider, by a nurse under direct supervision of a health care provider, or by a provider of health care services (e.g., physical therapist) under orders of, or on referral by, a health care provider; or

(2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

(3) The requirement in paragraphs (a)(1) and (2) of this section for treatment by a health care provider means an in-person visit to a health care provider. The first (or only) in-person treatment visit must take place within seven days of the first day of incapacity.

(4) Whether additional treatment visits or a regimen of continuing treatment is necessary within the 30-day period shall be determined by the health care provider.

(5) The term extenuating circumstances in paragraph (a)(1) of this section means circumstances beyond the employee's control that prevent the follow-up visit from occurring as planned by the health care provider. Whether a given set of circumstances are extenuating depends on the facts. For example, extenuating circumstances exist if a health care provider determines that a second in-person

visit is needed within the 30-day period, but the health care provider does not have any available appointments during that time period.

(b) Pregnancy or prenatal care. Any period of incapacity due to pregnancy, or for prenatal care. See also § 825.120.

(c) Chronic conditions. Any period of incapacity or treatment for such incapacity due to a chronic serious health condition. A chronic serious health condition is one which:

(1) Requires periodic visits (defined as at least twice a year) for treatment by a health care provider, or by a nurse under direct supervision of a health care provider;

(2) Continues over an extended period of time (including recurring episodes of a single underlying condition); and

(3) May cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.).

(d) Permanent or long-term conditions. A period of incapacity which is permanent or long-term due to a condition for which treatment may not be effective. The employee or family member must be under the continuing supervision of, but need not be receiving active treatment by, a health care provider. Examples include Alzheimer's, a severe stroke, or the terminal stages of a disease.

(e) Conditions requiring multiple treatments. Any period of absence to receive multiple treatments (including any period of recovery therefrom) by a health care provider or by a provider of health care services under orders of, or on referral by, a health care provider, for:

(1) Restorative surgery after an accident or other injury; or

(2) A condition that would likely result in a period of incapacity of more than three consecutive, full calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), or kidney disease (dialysis).

(f) Absences attributable to incapacity under paragraph (b) or (c) of this section qualify for FMLA leave even though the employee or the covered family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three consecutive, full calendar days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack or because the employee's health care provider has advised the

16

employee to stay home when the pollen count exceeds a certain level.  An employee who is pregnant may be unable to report to work because of severe morning sickness.

Given the extensive definition of "continuing treatment by a health care provider," and the various means by which the definition is satisfied, Defendant's argument that there is no evidence that Ms. Brown received "continuing treatment" from a health care professional fails at this stage of the proceedings.  This is particularly true in this case since the approved FMLA leave relates not to Plaintiff's medical or health conditions, but to the need to accompany and provide support to his wife.  The record shows that Plaintiff had continuing problems with a lump on her elbow and had had several appointments for diagnosis and treatment.  It cannot be concluded on the record presented that her problem with her elbow on September 27, 2013 was unrelated to her serious health conditions, and even more so, to the approved FMLA intermittent leave, which was approved for Plaintiff to be present with his wife to address her chronic conditions requiring treatment (Pl. Ex. 2, Dkt 100-16 at PageID.978).  Plaintiff has raised genuine issues of material fact with respect to element three of his FMLA interference claim to survive summary judgment.

## 2.  Element 4—Notice

Defendant argues that Plaintiff failed to provide the required notice of his intention to use FMLA leave, and failed to make a reasonable effort to schedule the treatment so as not to unduly disrupt Defendant's operations, as required by the FMLA.  However, Defendant has failed to show that it is entitled to judgment as a matter of law on these bases; and again, these issues involve disputed questions of fact, which preclude summary judgment.

Defendant relies on the FMLA regulations for notice where the FMLA leave is "foreseeable," which require that an employee "provide the employer at least 30 days advance notice

17

before FMLA leave is to begin if the need for the leave is foreseeable … ," or "[i]f 30 days notice is not practicable, such as because of a lack of knowledge of approximately when leave will be required to begin, a change in circumstances, or a medical emergency, notice must be given as soon as practicable." 29 C.F.R. § 825.302(a). Further, employees are required "to comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent unusual circumstances." 29 C.F.R. § 825.302(d). "Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied." *Id.* Defendant asserts that for planned medical treatment, "the employee must consult with the employer and make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations, subject to the approval of the health care provider." 29 C.F.R. § 825.302(e); *see also* 29 C.F.R. § 825.203, 29 U.S.C. §2612(e)(2)(A). Defendant notes that even if the leave is unforeseeable, "an employee must provide notice to the employer as soon as practicable … ."[4] 29 C.F.R. § 825.303(a). "It generally should be practicable for the employee to provide notice of leave that is unforeseeable within the time prescribed by the employer's usual and customary notice requirements applicable to such leave. See § 825.303(c)." *Id.*

Defendant argues that Plaintiff was aware as early as September 26 of his wife's desire to visit the doctor and could have reported his need for FMLA leave on that evening. Or, he could have mentioned the leave during his four-hour overtime shift. Or, he could have reported his

---

[4]Defendant omits the remainder of the quoted regulation (Def. Br., Dkt 97 at PageID.562), which states in full: "When the approximate timing of the need for leave is not foreseeable, an employee must provide notice to the employer as soon as practicable *under the facts and circumstances of the particular case*." 29 C.F.R. § 825.303(a). (emphasis added).

absence one hour before his 7 AM regular shift, as required by the Collective Bargaining Agreement (CBA).  And he could have scheduled the visit after his regular shift ended at 3 PM to avoid disrupting Defendant's operations, since Dr. Ismailoglu's office was open until 5:00 p.m.

Plaintiff argues that the notice issue is groundless.  Plaintiff agrees that the FMLA regulations require that an employee has to comply with an employer's usual and customary notice procedures applicable to FMLA leave, including the time for giving notice of it; however, Plaintiff asserts that Defendant maintained no policies concerning notice for FMLA leave.  Plaintiff asserts that even if the general attendance policy in the expired CBA, which required an employee to call an hour before an absence, applied to FMLA leave, employers may not deny relief under the FMLA because of the employee's failure to comply with an employer's internal notice procedures, *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713 (6th Cir. 2003).[5]  Plaintiff argues that the only notice requirement imposed on him was that of the third-party administrator Defendant hired to administer its FMLA leave, which required an employee to provide notice within two days of having taken the leave.  Plaintiff states that he complied with that notice requirement by providing notice of his leave at 8:09 a.m. on September 27, 2013.

In reply, Defendant asserts that Plaintiff obfuscates the facts.  Defendant argues that Plaintiff was obligated to provide notice under the regulations "as soon as practicable," 29 C.F.R. § 825.302(a), (b); 29 C.F.R. § 825.303(a), which he failed to do on multiple occasions.

---

[5]The holding in *Cavin* on which Plaintiff relies appears to no longer be valid, since it was based on regulatory language that is no longer in effect; the regulation was materially altered in the revisions to the FMLA regulations effective January 16, 2009. *See Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 614-15 (6th Cir. 2013).

The Court finds the parties' opposing statements of the law insufficient to resolve the issue of notice.  It is not clear that the specific regulations cited provide the proper legal framework for notice in the circumstances presented.  For instance, the Court is not persuaded that Defendant's reliance on the regulations regarding foreseeable FMLA leave, 29 C.F.R. § 825.302, as opposed to regulations for unforeseeable FMLA leave, 29 C.F.R. § 825.303, is appropriate here.  Further, as noted above, although Defendant argues that Plaintiff failed to give notice "as soon as practicable," Defendant ignores the remainder of the sentence in § 825.303(a), which concludes: "under the facts and circumstances of the particular case."   Likewise, Defendant disregards the provision in § 825.303, for foreseeable leave, which defines "as soon as practicable" as follows:

> As soon as practicable means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case.  When an employee becomes aware of a need for FMLA leave less than 30 days in advance, it should be practicable for the employee to provide notice of the need for leave either the same day or the next business day.   In all cases, however, the determination of when an employee could practicably provide notice must take into account the individual facts and circumstances.

29 C.F.R. § 825.302(b).

Nor does the Court find the authority cited by Plaintiff controlling, particularly *Cavin*, where the FMLA regulations underlying the holding have been superseded by amendments, as more recently discussed by the Sixth Circuit in *Srouder v. Dana Light Axle Manufacturing, LLC*, 725 F.3d 608, 613-15 (6th Cir. 2013).  In *Srouder*, *id.* at 613, the court specifically addressed the question "whether an employer may impose and enforce its own internal notice requirements, even if those requirements go beyond the bare minimum that would generally be sufficient under the FMLA to constitute proper notice," and explained:

> This Court previously addressed this question in *Cavin v. Honda of America Manufacturing, Inc.*, 346 F.3d 713 (6th Cir. 2003).  In *Cavin*, the employer (Honda)

20

required its employees to notify the leave coordination department for absences
continuing for more than one day. *Id.* at 716. If the need for leave was
unforeseeable, the employee was required to request leave within three days. *Id.* If
an employee was absent for three consecutive workdays and failed to notify the leave
coordination department, that employee would be separated from employment. *Id.*

This Court held that "the FMLA does not permit an employer to limit his
employee's FMLA rights by denying them whenever an employee fails to comply
with internal procedural requirements that are more strict than those contemplated
by the FMLA." *Id.* at 720. The rationale for this holding was the then-current text
of the regulation for foreseeable FMLA leave.[4] At that time, 29 C.F.R. § 825.302(d)
provided:

"An employer may ... require an employee to comply with the employer's
usual and customary notice and procedural requirements for requesting leave....
However, failure to follow such internal employer procedures will not permit an
employer to disallow or delay an employee's taking FMLA leave if the employee
gives timely verbal or other notice."

The *Cavin* panel reasoned that "[i]n permitting employers to develop notice
procedures, the Department of Labor did not intend to allow employers in effect to
undermine the minimum labor standard for leave." 346 F.3d at 722. The Court
concluded "that employers cannot deny FMLA relief for failure to comply with their
internal notice requirements. Therefore, ... Honda could not interfere with Cavin's
FMLA rights by enforcing its notice requirements to deny Cavin benefits to which
he otherwise may have been entitled under the FMLA." *Id.* at 723.

However, the regulatory language underlying this holding in *Cavin* is no
longer in effect. In fact, the language of § 825.302(d) was *materially* altered in the
revisions to the FMLA regulations effective January 16, 2009. That subsection now
provides, in part:

"An employer may require an employee to comply with the employer's usual
and customary notice and procedural requirements for requesting leave, absent
unusual circumstances .... An employee ... may be required by an employer's policy
to contact a specific individual. Unusual circumstances would include situations
such as when an employee is unable to comply with the employer's policy that
requests for leave should be made by contacting a specific number because on the
day the employee needs to provide notice of his or her need for FMLA leave there
is no one to answer the call-in number and the voice mail box is full. *Where an
employee does not comply with the employer's usual notice and procedural
requirements, and no unusual circumstances justify the failure to comply,
FMLA-protected leave may be delayed or denied ....*

21

29 C.F.R. § 825.302(d) (emphasis added).  This language explicitly permits employers to condition FMLA-protected leave upon an employee's compliance with the employer's usual notice and procedural requirements, absent unusual circumstances.[5]  Thus, to the extent *Cavin* held to the contrary, its holding has been effectively abrogated by the subsequent revisions to § 825.302(d).[6]

It is true that *Cavin* based its rationale not only on the language of § 825.302(d), but also on the general purpose and policy underlying the FMLA.  *See* 346 F.3d at 720-23.  However, to enforce *Cavin's* holding in the face of the express, plain language of the revised regulation would be to ignore the revision's plain language designed to address the giving of notice for foreseeable leave.

Thus, in light of the revisions to § 825.302(d), we hold that an employer may enforce its usual and customary notice and procedural requirements against an employee claiming FMLA-protected leave, unless unusual circumstances justify the employee's failure to comply with the employer's requirements.

*Srouder*, 725 F.3d at 613-15 (footnotes omitted).  Although the discussion in *Srouder* addressed § 825.302(d) governing foreseeable leave, § 825.303(d), contains a nearly identical provision: "If an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied."

The FMLA regulations are detailed and extensive.  It is clear from the Sixth Circuit's discussion in *Srouder* that the issue of notice must be decided under the proper legal framework, giving full consideration to important nuances in the regulations—nuances that the parties' analyses do not encompass.  The bottom line is that the resolution of the issues raised in this case hinges on the application of the proper legal framework—not yet defined—and the underlying circumstances—which requires the resolution of disputed factual issues not properly resolved on a motion for summary judgment.  Viewing the evidence and all reasonable inferences in favor of Plaintiff as the Court must, *see Burgess*, 735 F.3d at 471; *U.S. S.E.C.*, 712 F.3d at 327, there are genuine issues of material fact whether Plaintiff has established the necessary elements of a prima

facie FMLA interference claim, and thus, Defendant's motion for summary judgment of this claim
is denied.

### C. FMLA Retaliation/Discrimination Claim

To establish a prima facie case of FMLA retaliation/discrimination, a plaintiff must show:
(1) that he engaged in protected activity, i.e., availed himself of a protected right under the FMLA
by notifying the employer of his intent to take leave; (2) that he suffered an adverse employment
action; and (3) that there was a causal connection between the exercise of his rights under the FMLA
and the adverse employment action. *Edgar v. JAC Prods.*, 443 F.3d 501, 508 (6th Cir. 2006).

Defendant acknowledges that Plaintiff suffered an adverse employment action, and assumes
for purposes of summary judgment that Plaintiff engaged in protected activity. Defendant argues,
however, that Plaintiff cannot establish element three of the prima facie case—a causal connection
between any protected activity and his termination. Defendant argues that Plaintiff's employment
was terminated based solely on his refusal to work the back tender position, not any request for
FMLA leave. Defendant points out that Plaintiff's retaliation case rests on the fact that he was
terminated after he refused a work order and referenced the FMLA.

Plaintiff argues that he can easily establish a prima facie case of retaliation because
Defendant suspended him the day of the incident and terminated his employment five days later.
Plaintiff argues that this temporal proximity alone is enough to establish a prima facie case of
retaliation. *See Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (citing
Sixth Circuit cases in which close temporal proximity was deemed evidence of a causal connection
for the purposes of establishing a prima facie case of retaliation). Plaintiff states moreover that
Defendant's assertion that Plaintiff refused a direct order before he referenced the FMLA is contrary

23

to record evidence.  Plaintiff asserts that in both of his conversations with Whitelow, his then shift supervisor, after Whitelow ordered Plaintiff to work a back tender job, Plaintiff stated that he could not because he had to leave for FMLA leave, and Defendant was well aware that Plaintiff was invoking the FMLA as his excuse to leave.

The key question here is whether a reasonable jury could find that there was a causal connection between Plaintiff's exercise of his FMLA rights and his termination.  *See Gipson v. Vought Aircraft Indus., Inc.*, 387 F. App'x 548, 557 (6th Cir. 2010).  The Court finds this a close call.  The weight of the evidence appears to make proof of causation an uphill battle for Plaintiff.  But mindful that it is not a proper role for this Court to weigh evidence, or evaluate credibility on a motion for summary judgment, the Court concludes that this question must be resolved in favor of denying Defendant's motion.  Plaintiff has presented evidence, if only minimally, to create material issues of fact at the prima facie stage of this case.

It is undisputed that Plaintiff invoked FMLA leave as a reason he could not work the back tender position when ordered to do so by Whitelow (JSMF ¶ 32).  Defendant argues that since Plaintiff raised FMLA only *after* he was assigned to the back tender position, the sequence of events precludes his retaliation claim.  *See Gipson*, 387 F. App'x at 557 ("[A]n employee may not insulate himself from a pending dismissal by opportunistically invoking the FMLA.").  However, here, unlike in *Gipson*, the evidence is not conclusive that Plaintiff invoked FMLA leave to insulate himself from dismissal.  Plaintiff presents evidence that his need for FMLA leave was established the night before when his wife told him she had to go to the doctor the next day, which if found to be credible, works against the claim that he merely invoked the FMLA leave to insulate himself from a pending dismissal.  Moreover, Plaintiff's termination did not occur until several days later

on either September 30, 2013 (according to Plaintiff) or on October 2, 2013 (according to Defendant), which in this case provides a basis for a causal connection between Plaintiff's FMLA leave and his termination.  Although this connection may be tenuous, Plaintiff presents additional evidence that calls into question whether he was properly discharged for "gross insubordination" under Rule 4 of the CBA.  Plaintiff points out that while Rule 4 renders the employee "subject to discharge" for "gross insubordination," Rule 5 applies to a "refusal to properly follow orders or instructions of supervisor pertaining to job or operation," and has a penalty of a written warning. And Plaintiff presents evidence that Defendant does not normally terminate employees for refusing to follow orders, and did not discharge another employee who refused to perform a back tender job (*see* Pl. Resp., Dkt 100 at PageID.806-09).  Viewing the evidence and all inferences in favor of Plaintiff, a reasonable jury could conclude that Defendant ultimately terminated Plaintiff for invoking FMLA leave.

### D.  Pretext

Defendant argues that even if Plaintiff establishes a prima facie case under the FMLA, his claims nevertheless fail because he cannot show that Defendant's legitimate reason for his discharge—gross insubordination—was pretext.[6]

The familiar burden-shifting test articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to claims under the FMLA.  *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir.

---

[6]Plaintiff argues that he has established direct evidence of discrimination or retaliation and thus need not introduce evidence of pretext (Pl. Resp., Dkt 100 at PageID.797-98).  Given that the facts underlying this purported evidence are disputed, the Court declines to proceed under the direct evidence framework.

25

2012; *Edgar*, 443 F.3d at 508.[7]   Thus, if Plaintiff establishes his prima facie case of FMLA interference or retaliation, the burden shifts to Defendant to articulate a legitimate reason for its termination decision.  *See Donald*, 667 F.3d at 761.  If Defendant articulates such a reason, then Plaintiff's claim survives summary judgment only if he can show that the stated reason is pretext for unlawful interference with FMLA rights, or retaliation for exercising FMLA rights.  *Id.* at 761-62.  At all times, the plaintiff bears the burden of proving his claims.  *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008).

A plaintiff may prove that the defendant's reason is a pretext for discrimination by demonstrating by a preponderance of the evidence that the employer's reason: (1) had no basis in fact; (2) did not actually motivate the termination; or (3) was not sufficient to justify the decision. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 758-59 (6th Cir. 2000); *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), overruled on other grounds; *see also Mencarelli v. Alfred Williams & Co.*, No. 15–6385, 2016 WL 4036393, at *4 (6th Cir. July 27, 2016).  The same evidence used to show a prima facie case may also be probative of pretext.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 143 (2000); *DeBolt v. Outboard Marine Corp.*, No. 1:99–CV–915, 2001 WL 311300, at *7 n.6 (W.D. Mich. Jan. 16, 2001).  "[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case 'and inferences properly drawn therefrom ... on the issue of whether the defendant's explanation is pretextual.'" *Reeves*, 530 U.S. at 143 (citations omitted).

_____

[7]There has been some question whether the *McDonnell-Douglas* burden-shifting framework applies to interference claims, but the Sixth Circuit has concluded that it is correctly applied to both interference and retaliation claims.  *Donald*, 667 F.3d at 762.

26

Defendant argues that Plaintiff cannot establish pretext under any of the three prongs. Defendant asserts that Plaintiff cannot show that there is no basis in fact for his discharge because Plaintiff was qualified to perform the back tender position; he was ordered to do so; and he refused. With respect to prong (2), Defendant argues that Plaintiff cannot show that an illegal motivation, i.e., FMLA leave, played a role in Plaintiff's discharge. Defendant argues that Plaintiff cannot establish pretext under prong (3) because Defendant's "Rule 4" decision falls within the business judgment rule, and his attempted comparisons to other employees fails since Plaintiff is not "similarly situated" to those employees (Def. Br., Dkt 97 at PageID.565-568; Reply, Dkt 101 at PageID.1161-1164).

Plaintiff's argument concerning pretext is not specific to any of the three means for showing pretext. Instead, Plaintiff generally cites evidence relied on to both establish a prima facie case of retaliation and to call into question Defendant's nondiscriminatory reason for his discharge (Dkt 100 at PageID.798-809). Plaintiff disputes the veracity of Defendant's claim that Plaintiff refused a direct order. Plaintiff cites evidence that, contrary to Defendant's claims, he did not refuse a direct order *before* he referenced the FMLA (*id.* at PageID.799). Plaintiff also disputes the veracity of Defendant's claim that it did not make the decision to terminate him until October 2, 2013, citing a notation on human resource records that his employment terminated September 27, 2016 (*id.* at PageID.799-800; Pl. Ex. 62).

Plaintiff also cites evidence, discussed above with respect to his prima facie case, that calls into question Defendant's reliance on Rule 4 as the appropriate disciplinary rule for the conduct at issue. Plaintiff points out that Rule 4 states, "gross insubordination, verbal abuse of supervisors, striking supervisor or other employee," and states that the penalty is "subject to discharge" (Dkt 100

at PageID.801).  He asserts that a Rule 5 violation is defined as "refusal to properly follow orders or instructions of supervisor pertaining to job or operation," with a penalty of a written warning, and a Rule 6 violation is defined as "Leaving the plant during work hours without permission of supervision [sic?] or leaving the plant or job at the end of the shift without proper relief or the permission of supervisor," with a penalty of 1 day off without pay (*id.*).  Plaintiff argues that a jury could conclude from this evidence that Defendant improperly characterized Plaintiff's conduct as a Rule 4 violation, despite that his conduct did not involve verbal or physical abuse, in order to justify terminating him.  Plaintiff also presents substantial evidence, in the form of disciplinary action taken by Defendant with respect to other employees, to show that Defendant does not normally terminate employees for Rule 4 violations.

Defendant disputes that the comparators cited by Plaintiff are appropriate based on the individual circumstances presented and the timing.  *See Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (a plaintiff must show that the "comparables" were similarly situated in "all of the relevant aspects" of the employment situation).  Defendant argues that the employees cited by Plaintiff are not appropriate comparators because their situations involved different supervisors, the behavior occurred years earlier, or the behavior was drastically different.  Thus, Plaintiff is not similarly situated to the comparator employees in "all of the relevant aspects." For example, Defendant points out that another employee, Scott Martin, who was not discharged for refusing to work the back tender position, was working under a different CBA, did not walk out of the plant when he refused to move up the line of progression—and "did not fabricate a doctor's appointment and start spinning an ever-shifting story about the office visit" (Def. Reply, Dkt 101 at PageID.1163).

28

However, even assuming Defendant's description of Martin's employment circumstances to be accurate, Defendant's assertion of Plaintiff's fabrication hinges on credibility, and is hardly a foregone conclusion when the facts are viewed in favor of Plaintiff, as the Court must, on summary judgment.  The Sixth Circuit has held that "to be deemed 'similarly-situated' in the disciplinary context, 'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'"  *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)).  Here, given the disputed factual record, and the varied factual circumstances surrounding the instances of discipline, the Court cannot conclude that the numerous employees cited by Plaintiff all fail as legally appropriate comparators.

"An employee lawfully may be dismissed, preventing him from exercising his statutory rights to FMLA leave or reinstatement, but only if the dismissal would have occurred regardless of the employee's request for or taking of FMLA leave."  *Wallace v. FedEx Corp.*, 764 F.3d 571, 590 (6th Cir. 2014) (quoting *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003)).  Here, Plaintiff has presented evidence to withstand summary judgment concerning this question.

## IV.  Conclusion

While Defendant may ultimately prevail in defending against Plaintiff's FMLA claims, the disputed factual issues before the Court, many of which hinge on credibility, preclude summary judgment.  On the record and arguments presented, the Court concludes that Defendant's motion for summary judgment of the FMLA claims is properly denied.  However, because Plaintiff is no longer proceeding with his association discrimination claim under the ADA, the Court will grant summary

judgment in Defendant's favor as to the ADA claim.  Accordingly, Defendant's motion is granted

in part and denied in part.

An Order will enter consistent with this Opinion.


Dated: November 17, 2016                      /s/ Janet T. Neff
                                             JANET T. NEFF
                                             United States District Judge